1
2
3
4

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DALE R. KRONBERGER | Case No.: |
| Plaintiff, | COMPLAINT |
| vs. | JURY DEMAND |
| SNOHOMISH COUNTY, A Municipal Corporation in the State of Washington, ROBERT TRENARY; STUART ANDREWS, M.D.; LAUREN KOOIMAN; JOY MAINE; ANDREW FLETCHER; RACHELLE OBERG (fka RACHELLE ROSE); SHANE STEVIE; ROBIN OTTO; ROXANNE MARLER, AND JOHN AND JANE DOES 1-10; and ARAMARK CORRECTIONAL SERVICES, LLC, a Delaware limited liability company registered to do business in the State of Washington. | |
| Defendants. | |

COMES NOW, Plaintiff, Dale R. Kronberger, by and through the undersigned counsel of record, and alleges as follows:

## I. IDENTIFICATION OF THE PARTIES

1.      Plaintiff Dale R. Kronberger is the father of Lindsay M. Kronberger, deceased.  At all relevant times, Mr. Kronberger was a citizen of the United States and lived in Snohomish

COMPLAINT - 1

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

County. Mr. Kronberger brings a claim individually under 42 U.S.C. 1983. Mr. Kronberger's daughter, Lindsay M. Kronberger ("Lindsay"), was 24 years old at the time she died on January 13, 2014, while housed in the medical housing unit of the Snohomish County Jail in Everett, Washington.

2.      At all relevant times, Defendant Snohomish County was a municipal corporation organized under the laws and Constitution of the State of Washington, which, by and through its agency, the Snohomish County Sheriff's Office Corrections Bureau, operated, managed, and controlled the Snohomish County Jail (SCJ) and employed, engaged and/or contracted with the remaining defendants.  Snohomish County is responsible for the acts and omissions of its agents, employees, contractors, and officials, including those whose conduct gives rise to this cause of action.

3.      At all relevant times, Defendant Robert Trenary, who is sued in his official capacity, was the Sheriff of Snohomish County, and was responsible for the Snohomish County Sheriff's Office Corrections Bureau and the SCJ's duty to have policies and procedures in place to protect inmates' constitutional rights to have access to and receive adequate medical care while in custody.

4..      At all relevant times, Defendant Stuart Andrews, M.D. was licensed in Washington State as a physician and was employed by and/or under contract with Snohomish County to provide physician and medical director services to Snohomish County for the benefit of inmates of the SCJ.  Dr. Andrews duties included, but were not limited to the following: on site consultation; examination of patients and/or chart review; orders for medications, labs, or other treatment for management of medical conditions; evaluation of inmates with chronic or medically complex

COMPLAINT - 2

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1   conditions; consultation by phone with SCJ practitioners to determine need for hospitalization,

2   medication changes, or other treatment for serious medical conditions; reviewing and approving

3   medical policies and clinic protocol, including identifying the need for new protocols; reviewing

4   medical services provided by Nursing staff; and issuing standing orders for medication and

5   treatment. At all relevant times, Dr. Andrews was acting within the course and scope of his

6   employment and/or agency.

7       5.     At all relevant times, Defendants Lauren Kooiman ("RN Kooiman") and Joy Maine

8   ("RN Maine) were licensed in Washington as Registered Nurses and employed by Snohomish

9   County as nurses at the SCJ. Their duties and responsibilities included performing nursing

10   assessments pursuant to protocols, assuring that inmate health care needs were met, and

11   coordinating appropriate follow up care.  At all relevant times, they were acting within the course

12   and scope of their employment and/or agency.

13       7.     At all relevant times, Defendant Andrew Fletcher ("Deputy Fletcher"), Defendant

14   Rachelle Oberg (fka Rachelle Rose) ("Deputy Oberg"), and Defendant Shane Stevie ("Deputy

15   Stevie"), were employed by Snohomish County as Corrections Deputies at the SCJ. Their duties

16   and responsibilities included providing for the custody and care of inmates, including monitoring

17   inmates' mental and physical health.  At all relevant times, Deputies Fletcher, Oberg, and Stevie,

18   were acting within the course and scope of their employment.

19       8.     At all relevant times, Defendant Robin Otto ("Sgt. Otto"), and Defendant Roxanne

20   Marler ("Sgt. Marler"), were employed by Snohomish County as Corrections Sergeants at the SCJ.

21   Their duties and responsibilities included providing for the custody and care of inmates, including

22   monitoring inmates' mental and physical health, and supervising corrections deputies while in the

23   COMPLAINT - 3

24

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1    performance of their duties.  At all relevant times, Sgts. Otto and Marler were acting within the

2    course and scope of their employment.

3            9.      At all relevant times, Defendant Aramark Correctional Services, LLC, ("Aramark")

4    was a Delaware Limited Liability Company registered to do business within the State of

5    Washington.  Defendant Aramark entered into a contract with Snohomish County to provide food

6    services to SCJ.  In discovery in a related case[1], Defendants Snohomish County, Robert Trenary,

7    Stuart Andrews, M.D. RN Kooiman, RN Maine, Deputy Fletcher, Deputy Oberg; Deputy Stevie,

8    Sgt. Otto, and Sgt. Marler, have alleged that Aramark is at fault for Lindsay's death because

9    Aramark provided the "juice" that SCJ supplied to inmates withdrawing from illegal drug use, and

10   it is unclear whether the "juice" contained the necessary electrolytes. Based on this, the

11   aforementioned defendants have alleged Aramark is a necessary party to that action. To avoid the

12   aforementioned defendants' attempts to reduce their responsibility and liability, Plaintiff hereby

13   joins Aramark as a party based on the aforementioned defendants' allegations.

## II.  JURISDICTION AND VENUE

15           10.     Jurisdiction is proper in Federal Court when an action is brought as a civil rights

16   deprivation of rights claim under the scope of 42 U.S. Code § 1983.

17           11.     Jurisdiction and venue are proper in the U.S. District Court of Western Washington

18   under 28 U.S. Code §1391 as the acts and omissions giving rise to this cause of action occurred in

19   Snohomish County which lies under the judicial jurisdiction of U.S. District Court of Western

20   Washington.

---

[1] Gohranson v. Snohomish County, et. al., 2:16-cv-01124-RSL.

COMPLAINT - 4

B REWE  L AYMAN  P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

### III. STATEMENT OF CLAIM

**A.     Defendants' Deliberate Indifference to Lindsay Kronberger's Serious Medical Needs.**

12.     On Friday, January 3, 2014, Lindsay was arrested and booked at the SJC.  At the time of her booking, Lindsay self-reported she was addicted to heroin, and answered "yes" to a question asking if she had withdrawal problems just like she had in her prior bookings.  In the early morning hours of January 13, 2014, Lindsay died in the Medical Housing Unit (MHU).  The Snohomish County Medical Examiner determined Lindsay's death was caused by "probable cardiac arrhythmia due [to] dehydration with electrolyte abnormalities due to opiate withdrawal."

13.     When persons addicted to heroin enter a jail, it is common for them to experience withdrawal.  Withdrawal from heroin is extremely painful, and can cause cold sweats, depression, anxiety, loss of appetite, unstable moods, muscle cramping, nausea, vomiting, diarrhea, and seizures.  Withdrawal itself is rarely fatal, but, if it causes uncontrolled vomiting and diarrhea, then dehydration can result.  Dehydration can be fatal. The foreseeable risk of becoming dehydrated during heroin withdrawal is well known in jails.

14.     Dehydration can cause extreme thirst, headaches, dry mouth, weakness, dizziness, confusion, sluggishness, fainting, anxiety, agitation, runny nose, sunken eyes, rapid heartbeat, low blood pressure, cramps, skin discoloration, gooseflesh, and shriveled, dry skin that does not bounce back.

15.     Electrolyte imbalance often accompanies dehydration.  Electrolytes are the minerals in bodily fluids that carry an electric charge. Loss of electrolytes can cause muscle rigidity, tremors, and changes in mental status and personality.  Proper electrolyte balance is vital for normal body function, and electrolyte imbalance can be fatal.

COMPLAINT - 5

B REWE  L AYMAN  P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

16.     Medical staff at SCJ consists of both county employees and contract/agency employees.  Snohomish County is responsible for establishing all medical policies and procedures within SCJ as well as for ensuring all medical staff are acting in compliance with those policies and procedures.

17.     When Lindsay was booked in the SCJ on the afternoon of January 3, 2014, RN Maine evaluated her.  Lindsay told RN Maine she had problems with withdrawal and had last used heroin that morning. RN Maine determined Lindsay should be housed in the MHU and placed Lindsay on a "detox" watch for heroin withdrawal.  RN Maine's handwritten entry on a form entitled "Progress Notes" lists Lindsay's weight as 97 pounds. Right above RN Maine's entry, another county nurse, Lisa Powell ("RN Powell"), wrote: "Note weight of 95 lbs. Appears emaciated – underweight."  RN Powell's note was dated one month prior (December 9, 2013).

18.     RNs use a preprinted MHU Withdrawal Form to record inmates' vital signs and to record whether an inmate received certain medications (Loperimide, Tylenol, Ibuprofen, or Emetrol).  These medications are part of the "standing orders" in place at the SCJ, and nurses can decide, without any consultation with an ARNP or physician, to administer them to inmates. There is also a place to record "Fluids."  The preprinted form indicates RNs are supposed to record vitals, fluids, and mediations at 9:00 a.m. and 7:00 p.m. each day – during day shift and swing shift.

19.     Agency nurse Gregory Hardy ("RN Hardy") and RN Maine evaluated Lindsay in the MHU on Saturday, January 4, 2014.  Both times, Lindsay's blood pressure was low and her heart rate was elevated. On the morning of Sunday, January 5, 2014, Lindsay's blood pressure had fallen to 90/50 and her heart rate was even higher at 144. There is no indication an ARNP was contacted to evaluate and manage Lindsay's continuing hypotensive/tachycardic symptoms. These

COMPLAINT - 6

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1   types of vital signs may represent shock and require medical intervention to prevent serious

2   injury/death. Instead, on Monday, January 6, 2014, at approximately 7:00 p.m., Lindsay was

3   released from SCJ after she was medically cleared by RN Hardy.

4         20.    Lindsay was only out of custody a short time.  She was booked back into the jail

5   around 4:00 a.m. on Tuesday, January 7, 2014.  RN Powell evaluated Lindsay in booking.

6   Lindsay's blood pressure remained low and her heartrate was elevated.  RN Powell placed Lindsay

7   back on "detox" watch for opiate withdrawal and assigned Lindsay to the MHU again. The Special

8   Watch Log that RN Powell completed at that time contains the handwritten notation "Push Fluids"

9   and appears to indicate Lindsay needed an evaluation.  RN Powell did not see Lindsay again until

10   after she was dead.

11         22.    When Lindsay arrived in the MHU approximately three hours later on January 7,

12   2014, RN Hardy was on duty. Despite the fact RN Hardy would have been aware of Lindsay's

13   medical condition from the day before, there is no indication RN Hardy questioned RN Powell

14   about her handwritten notations on the Special Watch Log. There is no indication Lindsay was

15   evaluated by Dr. Andrews or either of the ARNP's on duty on that day. There is no indication

16   anyone engaged in any planning to safely manage Lindsay's withdrawal – despite her earlier

17   hypotension/tachycardia over the course of January 4th – January 6th.

18         23.    On the evening of January 7, another county nurse assigned to the MHU, Jean

19   Leight ("RN Leight) gave Lindsay Emetrol, a medication for nausea, but there are no notations

20   regarding why she was giving Lindsay the medication or how much or often Lindsay reported

21   vomiting.  There is no indication RN Leight sought any kind of consultation from an ARNP or

22   administered the medication according to the manufacturer's recommendations.

23   COMPLAINT - 7

24

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1        24.     On Wednesday, January 8, 2014, Lindsay saw RN Hardy again.  Lindsay gave RN

2 Hardy a "Medical Services Kite" while RN Hardy assessed Lindsay's vital signs. In the kite,

3 Lindsay wrote "I need anxiety medication. I have been having panic attacks since finding out I'm

4 stuck here until at least Jan. 30th." RN Hardy's notation in Lindsay's Progress Notes states Lindsay

5 said she could not sleep and described her panic attacks as "severe." RN Hardy also gave Lindsay

6 Emetrol, but he also did not note how much Lindsay had been vomiting.  Again, there is nothing to

7 indicate RN Hardy administered the medication according to the manufacturer's recommendations.

8 RN Hardy noted a plan to follow up with a physician, but he did not follow up, and Lindsay was

9 not evaluated despite her ongoing medical concerns.

10       25.     There is no indication Dr. Andrews reviewed Lindsay's medical records or

11 evaluated her medical condition in order to provide oversight to the RNs monitoring her.

12       26.     On Thursday, January 9, 2014, agency nurse Sherrise Holland ("RN Holland")

13 assessed Lindsay in the morning.  RN Holland noted Lindsay's heart rate was elevated at 118. RN

14 Holland did not follow up with Dr. Andrews or contact either ARNP on duty. That evening,

15 agency nurse Linet Ngete ("RN Ngete") assessed Lindsay.  RN Ngete noted Lindsay's heartrate

16 had increased to 120, but still did not obtain or seek any further evaluation of Lindsay's medical

17 condition. Both RN Holland and RN Ngete recorded giving Lindsay another dose of Emetrol, but,

18 again, neither RN recorded how much Lindsey was vomiting or charted how they administered the

19 medication. Neither RN Holland nor RN Ngete consulted with Dr. Andrews or an ARNP.

20       27.     On the morning of Friday, January 10, 2014, RN Holland noted Lindsay's blood

21 pressure had dropped to 90/60 but her heart rate remained high at 115. RN Holland continued to

22 give Emetrol without noting how much Lindsay was vomiting or charting how she was

23 COMPLAINT - 8

24

**BREWE LAYMAN** P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1   administering the medication. RN Holland admitted to SCSO Detective Scott Wells that Lindsay's

2   vital signs continued to be abnormal and that Lindsay should have been improving by January 10,

3   2014. Despite this admission, RN Holland did not consult with Dr. Andrews or either ARNP on

4   duty about Lindsay's continuing hypotensive/tachycardia symptoms which indicated Lindsay's

5   condition was deteriorating and becoming emergent.

6       28.     By January 10, 2014, Lindsay had been in the SCJ one week. There is no indication

7   that any nursing supervisor, Dr. Andrews, or ARNP reviewed Lindsay's MHU Withdrawal Form

8   or Progress Notes or consulted with any of the RNs to manage Lindsay's withdrawal.

9       29.     That afternoon/evening, another county nurse, Betty Lusk ("RN Lusk") recorded

10  that Lindsay continued to be hypotensive and had "emesis x 2," meaning Lindsay had vomited

11  twice.  RN Lusk was concerned enough about Lindsay's continuing high heart rate that she

12  checked it twice during her shift, and she contacted county ARNP Dan Miller to obtain an order

13  for a Phenergan suppository.  Phenergan is an antiemetic to reduce vomiting.  Despite Lindsay's

14  emesis, low blood pressure, and increased pulse – all signs of dehydration – there is no indication

15  ARNP Miller actually evaluated Lindsay before prescribing Phenergan.  RN Lusk gave Lindsay

16  Phenergan at 10:00 p.m.  Despite the fact no physicians or ARNPs would be on duty for the next

17  two days (over the weekend), ARNP Miller did not make any plans for monitoring or follow up

18  after Lindsay received the medication.  Lindsay refused the next dose of Phenergan at 2:00 a.m.,

19  telling agency nurse Elaine Gravatt that the medication gave her loose stools. Diarrhea is another

20  risk factor during opiate withdrawal, but RN Gravatt did not document anything further about

21  Lindsay's condition at the time she refused the medication.  RN Gravatt did not consult with an

22  ARNP regarding Lindsay's changed condition or medication refusal.

23  COMPLAINT - 9

24

B REWE   L AYMAN   P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1      30.     Later in the morning on Saturday, January 11, 2014, RN Kooiman assessed Lindsay

2 in the morning and recorded Lindsay's blood pressure as 80/40 and her heart rate as 65. This low

3 blood pressure suggests shock and is potentially life threatening.  When interviewed by Detective

4 Wells, RN Kooiman said "it was just a real uphill struggle to get a handle on what was going on"

5 with Lindsay. Despite her subjective recognition of Lindsay's overall deteriorating condition, RN

6 Kooiman ignored Lindsay.  RN Kooiman did not seek any further evaluation or consultation from

7 Dr. Andrews or an ARNP thereby exposing Lindsay to a grave risk of harm. The Special Watch

8 Log indicates Lindsay was "checked by nurse" again at 1:30 p.m., but no vitals are recorded on the

9 MHU Withdrawal Form, and no other indication regarding Lindsay's condition was made.

10      31.     At approximately 2:40 p.m. on January 11, 2014, Lindsay was moved from the

11 MHU to the Observation Unit (OU). In her interview with Detective Wells, RN Kooiman indicated

12 that OU was not a good place to house someone who is withdrawing, yet she apparently went

13 along with the housing change. RN Kooiman also indicated that Lindsay requested to go to the

14 hospital, but that she (RN Kooiman) did not feel it was necessary. That evening, RN Maine

15 assessed Lindsay.  Although Lindsay's blood pressure had risen, her heart rate remained markedly

16 increased at 110.  The MHU Withdrawal Form indicates RN Maine gave Lindsay Loperimide to

17 control diarrhea. RN Maine did not seek a consultation with Dr. Andrews or ARNP Miller to

18 report Lindsay's refusal to take the previously prescribed Phenergan (because it caused her to have

19 diarrhea) and the change to Loperimide.  By this time, Lindsay's condition had been unstable for

20 nine (9) days.

21      32.     The next day, Sunday, January 12, 2014, was Lindsay's last day alive.  That

22 morning RN Kooiman noted Lindsay's blood pressure was low and heart rate was still elevated –

23 COMPLAINT - 10

24

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1   continuing signs of dehydration. In her interview with Detective Wells, RN Kooiman admitted she

2   felt Lindsay was a high risk inmate because of her slight build/low weight and was unsure about

3   how much Lindsay had been drinking or her frequency of vomiting.  Despite all of these

4   comments, RN Kooiman did not weigh Lindsay or take any action to evaluate her for dehydration.

5       33.     RN Maine took over Lindsay's care from RN Kooiman in the OU. Deputy Stevie

6   was on duty in the OU, and stated that Lindsay was housed alone because she was so sick. Deputy

7   Stevie observed several biohazard bags outside and inside her cell filled with vomit.  Deputy

8   Stevie noted that Lindsay's voice was weak, her attention span was short, and she could only sit up for a

9   short period of time. Deputy Stevie did not bring his observations to the attention of RN Maine.

10      34.     At 5:10 p.m., Lindsay was moved back to the MHU.  She asked for a wheelchair to

11  go from the OU to the MHU, but Deputy Oberg and Deputy Stevie told her no. Deputy Oberg

12  noted Lindsay was "conscious but seemed to have a blank expression."  When Lindsay stood in

13  her cell in OU, Deputy Oberg began to pat her down, but Lindsay's legs went weak and she started

14  to fall to the ground.  Deputy Oberg and Sgt. Otto lifted her up and, each on one side supporting

15  Lindsay under her arms, half carried, half dragged her to the MHU. Sgt. Otto had to hold Lindsay

16  up while Deputy Oberg searched her again inside her cell at MHU, and then they laid Lindsay

17  down on her mattress.

18      35.    RN Maine was at the nurses' station in MHU and watched Deputy Oberg and Sgt.

19  Otto put Lindsay in her cell. RN Maine did not bother to assess Lindsay at that time despite the fact

20  that weakness and/or dizziness is another clear sign of dehydration. Sgt. Otto later told Detective

21  Wells that RN Maine said she had "just seen" Lindsay in the OU, had poured her some juice, and

23  COMPLAINT - 11

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1   that she was standing up. In reality, RN Maine saw Lindsay at 2:30 p.m. – almost three (3) hours

2   earlier.

3          36.      At 7:00 p.m. Deputy Fletcher reports Lindsay started to pass out as she was trying

4   to get some juice.  He called for assistance. Sgt. Marler and Deputy Oberg report they assisted

5   Lindsay back into her bed.  RN Maine reports she assessed Lindsay and her vitals were "stable and

6   improving from her previously recorded vital signs."  This is not accurate.  According to the MHU

7   Withdrawal Form, Lindsay's vital signs were the same as earlier in the day – her blood pressure

8   was still low and her heart rate was still high.

9          37.      Sometime shortly after 8:15 p.m. Deputy Fletcher reports Lindsay asked for juice,

10  and he told her to come out of her cell and get it.  He stated he does this so he can assess an

11  inmate's condition.  Lindsay walked to the juice cart and then her legs gave out and she grabbed

12  the cart.  Deputy Fletcher reports he grabbed Lindsay's arm and called for backup.  Deputy

13  Fletcher states Sgt. Marler arrived and helped place Lindsay back into bed.  Sgt. Marler's report

14  states that she arrived in the MHU and saw Lindsay lying on the floor of her cell next to her bed

15  wearing her jail uniform top and "her sheet around her waist and legs."  Sgt. Marler also states she

16  moved Lindsay's bed closer to the toilet so "she didn't have to try to get up out of bed and walk to

17  it, she could just pull herself up on it."  Neither Deputy Fletcher nor Sgt. Marler notified RN Maine

18  regarding this incident.

19         38.      Deputy Fletcher next reports he spoke with Lindsay sometime between 9:30 p.m.

20  and 10:00 p.m. because she moved her bed closer to the door. RN Maine reports she last observed

21  Lindsay sleeping in her bed around 9:30 p.m. She did not reassess Lindsay's vital signs before

22  leaving the MHU and returning to the clinic at the end of her shift.

23  COMPLAINT - 12

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

24

ea104r11y5

1    39.    Deputy Fletcher reported he checked Lindsay every half hour and "nothing

2    significant" happened before he left SCJ at the end of his shift at midnight.

3    40.    Corrections Deputy Scott Maxey took over from Deputy Fletcher.  Deputy Maxey

4    reports he looked inside Lindsay's cell at 12:03 a.m. and she was lying on her side with no blankets

5    covering her.  Thirty minutes later, Lindsay was lying on her side with a blanket covering her legs.

6    The next time Deputy Maxey looked in Lindsay's cell, she was face down in the toilet.

7    41.    Deputy Maxey called a medical emergency, and entered her cell. Additional

8    Corrections Deputies arrived and moved Lindsay from the toilet to her bed and then out into the

9    hall.  Efforts to resuscitate Lindsay failed, and she died without ever regaining consciousness.

10    42.    As part of her autopsy, Lindsay was weighed.  She weighed 89 pounds.  Lindsay

11    had lost 8 pounds over the 9 days she was in SCJ.

12    43.    SCJ surveillance video exists showing Lindsay in the MHU on January 12, 2014

13    between 5:00 p.m. and her death approximately 7.5 hours later.  Surveillance video prior to

14    January 12, 2014, was not preserved by the SCJ despite Plaintiff's request, two days after Lindsay

15    died, that SCJ preserve all video showing Lindsay anywhere in the SCJ between January 3 and

16    January 13, 2014. SCJ has no explanation for its failure to preserve video, and simply told Plaintiff

17    the video was either recorded over or may not have ever been recorded in the first place.

18    44.    The surveillance video that does exist reveals Defendants' deliberate indifference to

19    Lindsay's deteriorating condition. Surveillance video shows Deputy Oberg and Sgt. Otto

20    dragging/carrying Lindsay into the MHU. Deputy Oberg kicks Lindsay's "bin box" containing her

21    belongings down the hall from OU to MHU. Deputy Fletcher and Sgt. Marler laugh and joke about

22    Lindsay's condition. Deputy Fletcher mimics Lindsay sliding to the ground, and Sgt. Marler laughs

23    COMPLAINT - 13

24

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1  and responds with exaggerated hand movements feigning Lindsay's level of distress.  Sgt. Otto

2  observes Deputy Fletcher dancing outside of Lindsay's cell.  Deputy Fletcher repeatedly "knuckle

3  bumps" other corrections personnel.  Additionally, the surveillance video is not consistent with the

4  later written reports and records from Deputy Fletcher, Sgt. Marler, Deputy Oberg and RN Maine.

5       Surveillance video and

6  **B.   SCJ's Policies, Practices, Customs and Systemic Deficiencies.**

7       45.   By January 3, 2014, the SCJ had come under increasing scrutiny because of the

8  unusually high number of deaths within the jail.  By that date, nine (9) people had died since 2010

9  while incarcerated at SCJ.

10       46.   SCJ was well aware of the problems it had with its medical unit.  In July 2013, SCJ

11  sought advice from the Pierce County Sheriff's Office, which operates the Pierce County Jail.  In

12  seeking that advice SCJ acknowledged concerns regarding the competency of some of the

13  contract/agency nurses from Maxim and Cascade.  Pierce County assessed the SCJ's medical unit.

14  Pierce County did not make any written findings regarding their review because of concerns

15  regarding public disclosure requests.

16       47.   In August 2013, Pierce County officials met with Sheriff Trenary and other

17  administrative officials in the Snohomish County Sheriff's Office and the Corrections Bureau/SCJ.

18  In response to a public disclosure request to Snohomish County, Plaintiff received written minutes

19  from the meeting.  Those minutes indicate that Pierce County officials warned Snohomish County,

20  in part, that

21      [t]he "Agency" nurses are not the best types of people in relationship to regular staff
members.  Most "Agency" staff just wants (working hours); they are not invested in an
22  institution's programs or (best) care practices.  "Agency" staff is an "in/out" staff that

23  COMPLAINT - 14

**BREWE LAYMAN** P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

24  ea104r11y5

doesn't really care what's happening.  This type of attitude and work ethic actually hurts the morale of regular jail staff.

[SCJ] definitely has a lack of staff which equates to "delay's and denials" of care which is both harmful to the patient and the organization.

[SCJ] needs better documentation/forms for charting purposes.  There is a high level of vulnerability in this area for the jail.  [SCJ's] current charting practices are not protecting [SCJ]/.  While [SCJ's] protocol is good, there is no proper and/or accurate and complete documentation.  This is difficult to defend with lawsuits.'

One major overall concern…is that [SCJ] should have more "clinician" (physician) review, direction and assistance.  The lack of leadership from a clinician (physician) is a prominent factor in [SCJ's] mortalities.  The RNs need better/more training.

Typically, in a well functioning organization, there are cross-checks between Custody staff/medical staff/mental health staff.  Each role contributes as an active participant in the care and well-being of the patient. Therefore, training is crucial.  Access to medical care for the inmate is essential.

There are no intervention efforts being undertaken or conducted. A common fallback to accommodate shortfalls for staffing and care is that the inmate is tagged as "feigning" their need for care.  This then becomes part of the "culture" as is the case for [SCJ].

48.     In September 2013, the United States Department of Justice National Institute of Corrections (NIC) conducted an assessment of SCJ's medical, mental health, and suicide prevention policies and practices. The report summarizing the NIC's assessment was released to the public in November 2013. The report confirmed that there were systemic and gross deficiencies in SCJ's staffing, facilities, equipment, procedures, and policies (or lack thereof).  The NIC assessment concluded "inadequate health care staffing levels, unqualified intake health screens, absence of clear and formal policies and procedures, and a lack of a functional records system make timely and consistent access to appropriate health care virtually impossible."

49.     Citing the high mortality risks associated with alcohol and opioid withdrawal complications, the NIC report recommended SCJ "develop and implement evidence-based

COMPLAINT - 15

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1  withdrawal intervention and treatment policies."  In a response from SCJ pursuant to a public

2  disclosure request, SCJ stated it did not have specific withdrawal policies in place in January 2014

3  and "inmates having opiate withdrawal symptoms were managed individually by the ARNPs in the

4  medical clinic."

5       50.    SCJ's training and policies, if any, were wholly inadequate to meet the needs of any

6  inmate suffering from withdrawal.  Despite clear notice from both Pierce County and the NIC

7  regarding dangerous medical deficiencies in the jail, SCJ continued on with its culture of

8  indifference towards the medical needs of its inmates.  RNs and Corrections personnel ignored

9  Lindsay's deteriorating condition, failed to consult with more experienced medical staff (ARNP or

10  physician), and failed to transfer her medical care to a hospital despite clear signs of imminent peril

11  over the last few days of her life.

12  **IV.    CAUSE OF ACTION:**
**SECTION 1983 CIVIL RIGHTS VIOLATION**

13  **14th AMENDMENT RIGHTS – LOSS OF PARENT CHILD RELATIONSHIP**

14       51.    Parents have long been recognized as having standing to sue for their own losses

15  associated with the wrongful death of a child by officials under 42 USC 1983.  Parents have a

16  constitutionally protected liberty interest under the 14th Amendment in the love, companionship

17  and relationship with their child.

18       52.    By virtue of the facts set forth above, the Defendants, through their deliberate

19  indifference, caused Plaintiff to be deprived of his constitutional right to love, society and

20  companionship with his daughter, Lindsay, for which he is entitled to compensatory and punitive

21  damages in an amount to be proved at trial.

23  COMPLAINT - 16

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

53.     By virtue of the facts set forth above, and as a result of its policies, practices and customs at the SCJ as described above, Defendant Snohomish County was aware of the inadequate medical care it was providing to its inmates and failed to adequately train and/or supervise its personnel with regard to the conduct described herein.  Defendant Snohomish County, through its deliberate indifference caused Plaintiff to be deprived of his constitutional right to love, society and companionship with his daughter, Lindsay, for which he is entitled to compensatory and punitive damages in an amount to be proved at trial.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

1.  Compensatory damages, including damages for pain, suffering, terror, and loss of consortium pursuant to 42 U.S.C. 1983, in an amount to be proven at trial;

2.  Costs, including reasonable attorneys' fees, and costs pursuant to 42 U.S.C. 1988 and to the extent available under the law;

3.  Punitive damages against the individual, non-municipal defendants to the extent authorized by law in an amount to be proven at trial;

4.  Declaration that the defendants are jointly and severally liable;

5.  Award of any and all applicable interest on the judgment;

6.  In addition to economic damages, plaintiff seeks alternative forms of relief pursuant to FRCP 8(a)(3) in the form of changes to medical policy, protocol and procedures at the Snohomish County Jail that would reduce the risk of unnecessary and preventable deaths due to incompetent medical care; and

7.  Any and all other such further relief as the Court deems just and equitable.

COMPLAINT - 17

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

ea104r11y5

1

## VII.  DEMAND FOR JURY TRIAL

2

Pursuant to FRCP 38(b), Plaintiffs hereby demand a jury for all issues triable.

3

Dated this 11th day of January, 2017.

4

5

s/  Karen D. Moore
6
s/  Kenneth E. Brewe
Karen D. Moore, WSBA #21328
7
Kenneth E. Brewe, WSBA #9220
Brewe Layman, P.S.
8
3525 Colby Avenue
Everett, Washington  98201
9
Telephone:  (425) 252-5167
Facsimile:  (425) 252-9055
10
Email:  Karenm@brewelaw.com
Email:  Kennethb@brewelaw.com

11

s/ Todd C. Nichols
12
s/ W. Mitchell Cogdill
Todd C. Nichols, WSBA #15366
13
W. Mitchell Cogdill, WSBA #1950
Cogdill Nichols Rein Wartelle Andrews
14
3232 Rockefeller Avenue
Everett, Washington  98201
15
Telephone:  (425) 259-6111
Facsimile:  (425) 259-6435
16
Email:  toddn@cnrlaw.com
Email:  wmc@cnrlaw.com

17

18

19

20

21

22

23

COMPLAINT - 18

24

ea104r11y5

**B**REWE  **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com